## HILL v. THE STATE.

The evidence for the State, though weak, authorized a conviction of murder. It was not error to refuse a new trial.

No. 5636.   July 15, 1927.

Murder.   Before Judge McLaughlin.   Harris superior court. August 14, 1926.

*R. Terry,* for plaintiff in error.

*George M. Napier, attorney-general, W. R. Flournoy, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

HILL, J.   The plaintiff in error was indicted, tried, and convicted of murder, with a recommendation to the mercy of the court. He made a motion for new trial on the usual general grounds only, which motion was overruled, and he excepted.   No error of law is alleged to have been committed on the trial.   Certain of the evidence on which the State relied for conviction was as follows:

C. A. Cannon testified: "I knew Seaborn Hill on the 18th day of July of this year, and I saw him between my house and Columbus that day, in Harris County.   At the time I saw him there at the place he was alone, and here is what happened: I had left home, I suppose about 2 o'clock, to go to Columbus; and after I crossed the Cow Pen bridge, just on top of the hill, I saw a car parked there, and I saw a person in the car laying with his head over like that, and I started on past.   Well, the defendant Seaborn Hill was standing, I suppose, thirty yards down the road from the car, and was waving across the road for me to stop.   Well, I thought they were drunk, and would not stop; and just as I started to drive by he said, 'He is dead, he is dead,' and I stopped and backed my car in front of the car that the dead negro was in, and I asked him who killed him, and he said he threw the pistol and hit the back of the car and killed himself.   The defendant was pretty well drunk.   I asked who the boy was; he told me it was his cousin, and I did not know who his cousin was or which one it was, and I walked back to the car and looked, and when I got back there it was John Starling Hill that was dead, and I did not examine anything but the front of him then.   I saw where he was shot under the neck there, and later on I got him home and found the shot entered from the right shoulder just at the point of the shoulder-blade and

Homicide, 30 C. J. p. 310, n. 25.

came out through here and went over the top, just directly over the steering-wheel post. I examined the back seat of the front seat of the car, and there was no bullet marks on it. I found a pistol in the car; that is the same pistol [as presented to the witness]. When the defendant told me that the pistol fired after being thrown to the back seat, I taken the pistol and tried to show him, and it would not shoot by being hit with a hammer, and nicked a small place on my hand when I taken it that way with the hammer down to show him that it would not shoot. I just taken the gun like this and hit down on my hand like that two or three times, and I think the last time I hit I nicked that place there on my hand, and the pistol did not fire then; the pistol was loaded then and on a loaded cartridge. I am familiar with a Smith & Wesson pistol such as this; that type of pistol is made a little piece that goes up under here under this hammer, and unless you pull the trigger it will not shoot. You might take a hammer and hit it something like that [indicating] hard enough to break that little piece in there and shoot; otherwise it would not shoot. When the trigger is pulled it pushes that little piece out of the way when the trigger is released. Now the hammer moves back slowly and this piece goes right up in the inside of the hammer. This pistol is not in the same condition now; then the trigger was up. The dead negro was John Starling Hill. I did not find any wound on him other than this. The point of entrance on the back, as best as I could remember, is right here [indicating], just about the point of that shoulder-blade. Right there is where it entered, the right shoulder; the point of exit, where it came out, just about that bone, right under the collar-bone, right there." Cross-examination: "If a pistol was cocked and thrown back it could go off; it could be possible it could go off. I would not say it was cocked or not, I was not there, I did not see it before it was shot. I do not know anything about that. . . Later on Mack Harris came back to the car, later on after the other three had gone up the road. Mack Harris was so drunk he could not do anything. That was Mack Harris's car. Mack Harris was on the highway there; he came to the car where I was and where the dead man was."

Otis Crawford testified: "I knew John Starling Hill in his lifetime. I know the defendant, Seaborn Hill. Along about the 18th day of July I saw these parties together; when I first saw

them they were at my aunt Mary Crawford's house, about 7 o'clock I suppose that morning, when I saw them at aunt Mary Crawford's house. I went somewhere with them. I came up the road a piece with them. I was driving Mack Harris's car. I was on the front seat of the car, I was driving the car. John Starling Hill was next to me. I think Gabe Walker was on the other side of John Starling, and Mack Harris was up there; there was four of us on the front seat. Seaborn Hill, Forger Patrick, and Charlie Hill was on the back seat. As I was going along the road a pistol fired. When the pistol fired I jumped out. I seen a pistol after it fired. Seaborn had the pistol after it fired. There is Seaborn Hill [pointing]. I do not know what Seaborn was doing with the pistol. When I seen it he had it sticking in his belt right here. John Starling got hurt, John Starling got shot. After the pistol fired I stayed there about two minutes before I walked off. I never did see John Starling Hill with that pistol. When I saw the pistol Seaborn Hill had it. His brother jumped out, too, when the pistol fired, and he says, 'You have done shot John Starling.' We all called him Boisey; and he said, 'You done shot Boisey.' Seaborn stayed there. Seaborn did not seem to be drunk; he was just drinking a little. Later on I talked to Seaborn in jail. He was speaking to me down there in jail about this case. He just told me to say that—asked me did I see this boy, and I told him no; he was talking about John Starling—when he handed the pistol back there, and I told him no, I did not see him; and he told me just to say that, he wanted me to see this boy when he handed the pistol back. I told him I could not say that, because I did not see it. . . The last time I saw the pistol Seaborn had it, and the next one I saw with it Mr. Cannon had it. That looks like a pistol; that seems like it is the same pistol I saw Seaborn with. John Starling never did say anything after he was shot, and John Starling Hill was not doing anything to Seaborn when he was shot, and he was not doing anything to him when the pistol fired. John Starling was sitting right sorter behind me, like I was sitting on the front like, there was not much room on the seat for me. I was just nipping just on the end of the seat, and he was sitting sorter behind me like; all the others were sitting on the side. I think Mack was sitting on Gabe's lap. After the pistol fired John Starling never done anything but fell over." Cross-examination: "I knew he

was shot when the boy told me he was shot. I did not know he was shot when the pistol fired. I thought it was a puncture until I jumped out and this boy spoke. I seen the pistol just as it shot. After I got out I seen this boy have it, after I got out of the car. This is not the first time I saw the pistol. I did not see him shoot the pistol. I did not see him hand it back to him, or throw it back over his shoulder. Driving the car in low gear, I had just took off a tire down at the bridge, and was coming up the hill. The car stopped just on top of the hill, when the shooting occurred."

Gabe Walker testified: "I knew John Starling Hill in his lifetime. I was with him the afternoon it is said he was killed. I was in the front seat of the automobile. I did not see Seaborn Hill with a pistol that afternoon. I saw somebody with a pistol after the shooting occurred. I saw Seaborn Hill with it then. I didn't see anybody else with it. I saw Seaborn with the pistol as soon after the shooting as the boy stopped the car and jumped out on the ground to see if he had a puncture, and Seaborn's brother said, 'You have shot John Starling.' Seaborn's brother was talking to Seaborn. He told Seaborn, he says, 'You have shot John Starling.' He says, 'No, I ain't.' He says, 'Yes, you is,' and so he says, 'You shot him right there in the back,' and the boy—after then the boy went to screaming and said he would not have done that for nothing in the world." Cross-examination: "I was in the car when the pistol fired. . . I was sitting in the car looking forward right when this gun fired. I was not looking back there. I don't know what was happening back there. I only heard a pistol fire, and I looked back after this boy stopped the car. . . I saw him when he jumped off and went around to look, and then I looked over here and see this boy with a pistol." Another witness testified: "Otis was there looking at his tires, and that white man spoke and said we had done shot, a white man, Charlie, and Charlie says, 'You done shot your brother.' He says, 'You done shot Boisey,' and Seaborn says, 'No, I ain't.' He says, 'Yes, you is,' and he says, 'I am going to get out and gwine on home.' That was Charlie."

Charlie Hill testified as follows: "I remember the day John Starling Hill got shot. I was sitting on the back seat. I was in the car. I was sitting back there on the back seat coming on down

the road, and coming on down the road there some of them says they had a puncture, and got out and looked, and I looked up and the boy was shot, and I seen the pistol when it come out, and he got it out of his inside coat pocket and handed it back over the seat. I don't know whether it hit the floor or not. I jumped out on the running-board, and I seen the thing was cocked when it come out of his pocket. When I saw the pistol I jumped on the running-board. John Starling had the pistol; he was the man who got shot; he handed it back over the seat back there; he had it in his left hand; he handed it back this way [indicating by putting hand under arm]; he handed it back over the seat; he took it out of his pocket this way and handed it back this way. I was sitting pretty close behind him, and my other brother was sitting right straight on the side where I was. Forger Patrick was back there, he was sitting on the back seat too, on the back seat on the outer edge. I did not hear the pistol shoot. I did not know what it was till they—they slowed the car down, and the smoke was all down in the foot of the car there. I did not see the pistol when it shot. Seaborn Hill is first cousin to John Starling Hill. There was no difficulty between them, no quarrel between them; they did not have any words between them that I know about; to my knowing they have been going together two years. I have never seen them in a fuss or nothing, just laughing and going on like they always do. I was sitting on the back seat with my brother when the pistol was handed over the seat. I was sitting right by him. I saw him hand it over the seat. I don't know who took that pistol, but I seen it cocked, and I jumped out. I don't know who took it; when I looked back in there it was laying on the floor. I saw the pistol come over the seat is what I mean to say, and then I made to get out of the car. . . The only one I saw with the pistol before it shot was John Starling Hill. It come out of his inside coat pocket. He handed it over the back of the seat there back there. That is all I seed; it came out of his pocket. I jumped on the running-board, and before I looked around it had done shot. Nobody got it then; they left it there; it was laying in the foot of the car." Cross-examination: "The pistol had a long barrel on it just like that; that is the pistol laying in the floor of the car, I went back and looked at it. He had on a blue coat, he took the pistol out with his right hand, but it

was in his right pocket. I thought I said it was his right hand; his right hand is the one I thought he took it out with. I just made a mistake when I said it was his left hand. That is about the way a Ford seat hits you in the back I reckon. I have ridden in them many times. I reckon the back of this chair hits me just about where a Ford would hit me; sitting in a car this way he handed it around back there. I would have a pretty hard time doing that, handing it back there. I seed it go over back there. I don't know whether it went through the seat or not; it went over the seat, for I seed it come over; he pushed it under like this; that is the way it got back there. I did not see it when it come back; it had done gone on top of the back of the seat. I seed it when the barrel of it was sticking up; he got it out of his inside pocket. . . I seed the pistol when he got in the car, and seed his hand when it brought it up. I can not see you getting anything out of your left coat pocket now, I would have to see through him if I saw it that way. I seed the pistol before he got in the car and I seed it after I got in the car when he was handing it back over the seat. When it came out of his pocket it was cocked; the hammer was back on it just like this. I did not see him put his hand on the trigger. I don't know whether he dropped it on the floor or not; when I seed it handed back I jumped out. I heard something just [like] a pistol going off. I was out of the car then. . . The pistol had done fired when I jumped over the other side there; the pistol did not shoot before he handed it back; after he handed the pistol back it fell down there, if nobody did not take it. I was looking right at it, and it was about the middle of the afternoon about two o'clock, a bright sunshiny day. I could see it all right. I watched the pistol come back there over this dead man's shoulder; when I seed the pistol come back there I did not know whether it hit the cushion. I don't know whether anybody got hold of it or not. The pistol was laying down there on the floor where it fell, I reckon. I did not see the pistol when it come out of his hand; when I seed' it it was laying on the floor. I watched the pistol go back over his shoulder, and then the next thing I saw it was on the floor. I did not see it when it shot. I seed the smoke; that is all I seed. I got out then. I did not tell my brother, 'You have shot Boisey.' I am confident I did not tell him that. I did not tell him that. I heard that after I done got home."

It is our opinion that the evidence for the State, though weak, was sufficient to authorize the verdict; and the court did not err in overruling the motion for new trial.

*Judgment affirmed. All the Justices concur, except*

RUSSELL, C. J., dissenting. According to the evidence in this case, seven negroes who were in a drunken condition were riding together in a Ford car. According to the undisputed evidence the negro who was killed was the only one who had a weapon before the homicide. The evidence that the decedent was attempting to pass the cocked pistol behind him at the time that the weapon was discharged and his death resulted is not disputed, nor is the fact that there had never at any time been any difficulty, quarrel, or dispute between the deceased and the accused in any wise questioned. That the negro boy was killed by the discharge of his own gun is certain. All else in the case is in doubt. There is no evidence that the accused would ever have had the pistol in his possession but for the fact that the deceased was either trying to throw or pass the pistol behind himself. No one saw the accused in possession of the pistol until after the death of the deceased. In a trial for crime the burden devolves upon the State to prove the guilt of the accused beyond a reasonable doubt; and where circumstantial evidence is relied upon, the evidence must be sufficiently certain to remove any other reasonable hypothesis than that of the guilt of the accused. If there is any reasonable supposition than that arising from the evidence which is consistent with the innocence of the accused, the humanity of the law requires that the theory consistent with innocence should prevail over that theory which is consistent with guilt. Penal Code (1910), § 1010.

Under the foregoing principles and the facts of this case, the ground of the motion for a new trial alleging that the verdict is contrary to the evidence and therefore contrary to law is well supported. A verdict based upon insufficient evidence is as thoroughly contrary to law as if it were based upon the most egregious error arising from erroneous instructions or the improper admission or rejection of testimony in the case. Looking to the statement of facts, the jury had nothing in this case upon which to base the verdict, except the fact that the defendant attempted to get a witness to testify that he saw the deceased reach over the back of

the front seat as he handed or passed back the cocked pistol of the deceased. An inference of guilt may arise where one accused of crime attempts to procure a witness to testify falsely; but in this case the State proved by another witness exactly what the accused asked the witness just referred to if he could not testify. The prosecution itself established the fact that the deceased himself took the pistol out of his inside blue coat pocket, and that it was discharged in attempting to pass or push it towards the rear of the car. No attempt was made to impeach this witness. There was no claim that the prosecution was entrapped by his testimony, and the most that any other witness would testify in the attempt to rebut this positive testimony was that they did not happen to see how the pistol got behind the deceased and fell upon the floor between the two seats of the Ford car where it was found after the shooting. Granting that the accused made an equivocal statement to Mr. Cannon in saying that the deceased "threw the pistol and hit the back of the car and killed himself," Mr. Cannon said in the same breath that "the defendant was pretty well drunk." Under a well-settled rule, the exculpatory language of a defendant as to the nature of a homicide is not to be turned against him, in the absence of positive proof that the story of the accused is false, and not even then unless it is material to the issue. In this case, in the absence of any testimony that the accused ever had the pistol in his hand until the person alleged to have been murdered was dead, and considering the drunken condition of the defendant, it is absolutely immaterial to the question of his guilt or innocence whether the pistol hit the back of the car before it discharged or whether it discharged in the hand of the defendant when he may have caught at the pistol in order to protect himself from being shot, or whether it hit some one of the four negroes sitting on the rear seat, and was thus discharged. It is immaterial how the pistol was discharged until it be shown that it was discharged from the hand of the accused. Upon the State the law places this burden. All of the testimony of Cannon that the pistol would not be discharged no matter how hard it might be hit was entirely immaterial in this case, in view of the fact that the undisputed testimony was that the pistol in this case was cocked at the time the deceased released his hold upon it, whether it was merely passed backwards or thrown backwards by the deceased. The

record shows that the accused, when all others but he had run away, stopped Mr. Cannon, who admits he would have passed by because he saw that Seaborn Hill, the accused, was drunk, and he supposed that John Starling Hill, the deceased, who was lying in the car, was also drunk, and he would have passed down the road as he was proceeding to do, except that the accused, shocked by the sudden death of his cousin, with whom he was on the most intimate terms, pointed to the deceased and cried out to him twice loudly, "He is dead, he is dead." If there is any potency in the rule that positive testimony is to be preferred to mere negative testimony where the witnesses have equal opportunities and are equally credible, then the mere fact that two of the intoxicated witnesses for the State did not see how the pistol got to the rear of the car must, upon principle, yield to the positive testimony of the State's witness, Charlie Hill, who testified, "I saw him [the deceased] hand it over the seat. I don't know who took that pistol, but I seen it cocked, and I jumped out. I don't know who took it; when I looked back in there it was lying on the floor. I saw the pistol come over the seat is what I mean to say, and then I made to get out of the car. . . The only one I saw with the pistol before it shot was John Starling Hill. It come out of his inside coat pocket. He handed it over the back of the seat there back there. That is all I seed; it came out of his pocket. I jumped on the running-board, and before I looked around it had done shot. Nobody got it then; they left it there; it was laying in the foot of the car." Mr. Cannon, who came up almost immediately, found the pistol lying in the foot of the car, and no one as yet has testified that the accused had the pistol in his hand before the deceased was shot and killed.

The testimony in this case discloses no motive, no animosity, or anything but the best of feeling between these two cousins. The State's witness, Charlie Hill, after the sudden discharge of the pistol (for some of the witnesses thought it was a blowout of the tire) "went back and looked at it," and it was "laying in the floor of the car." It may be that this conviction is based upon the belief that the witnesses for the State had not told the entire truth about it; but conviction of capital offenses can not properly be sustained in a court of review except upon sufficient proof to authorize conviction and punishment as prescribed by law.